OPINION OF THE COURT
John P. Colangelo, J.
Defendant Elvira Juarez is charged under a superceding misdemeanor information with a total of seven counts: the A misdemeanor of assault in the third degree (Penal Law § 120.00 [1]) and the B misdemeanor of attempted assault in the third degree (Penal Law §§ 110.00, 120.00); two counts of the A misdemeanor of menacing in the second degree (Penal Law § 120.14 [1]); two counts of the A misdemeanor of criminal possession of a weapon in the fourth degree (Penal Law § 265.01 [2]); and the violation of harassment in the second degree (Penal Law § 240.26 [1]).
This case revolves around an incident that took place during the evening of May 27, 2005 — the Friday of Memorial Day weekend — in front of defendant’s house in a residential neighborhood in White Plains, New York. The incident involved defendant and her former boyfriend, Salvador Toxtle. The information alleges that during the incident, defendant attempted to strike Toxtle with a “Club” (the Club, a steering wheel locking device), cut his finger with a kitchen knife, and menaced and harassed him with the Club and the knife. A nonjury trial was held on May 3 and 17, 2006. The People called Police Officer White and Lieutenant Schneider of the White Plains Police Department as well as Mr. Toxtle; defendant testified on her own behalf. The knife, the Club and documentary evidence including photographs and hospital records were introduced into evidence. Based on the evidence presented, the court makes the following findings of fact and conclusions.
*1133 Findings of Fact
The testimony of virtually all of the witnesses is consistent in one central respect: it reflects that the fulcrum of the case is a confrontation that centered around one motor vehicle, and was prompted, in part, by another. Defendant and Toxtle had dated, with fluctuating degrees of ardor, for approximately five years prior to May 2005. During their relationship, Toxtle purchased a car, a 1991 Honda. For reasons related to Toxtle’s immigration status, he asked defendant to place the title of the Honda in her name, which she did. Defendant drove the Honda from time to time when her own automobile needed to be repaired, but the car was otherwise under Toxtle’s control. At some point thereafter, their relationship cooled, and Toxtle located a buyer for the Honda. Before that transaction could be completed, however, he needed to obtain defendant’s consent to transfer the title of the Honda to his name. To that end, Toxtle approached defendant on two occasions on May 27, 2005: first, outside of the Bally’s health club in Port Chester, New York, where they had each concluded separate early evening work outs, and later in front of defendant’s home in White Plains.
As far as the incident outside of Bally’s is concerned, both defendant and Toxtle testified that a verbal confrontation did occur in the Bally’s parking lot that night. Although Toxtle testified that the discussion between him and defendant pertained only to the Honda, and defendant testified that Toxtle did not mention the car and sought only to convince her to resume their relationship, some combination of the two strands of conversation appears the most likely, particularly in view of Toxtle’s documented history of upbraiding defendant for dating or even being seen with other men. In any event, the somewhat heated conversation in the Bally’s parking lot ended abruptly when defendant refused to deal with Toxtle and sped off in her car (not the Honda) nearly running into him in the process. Unwilling to take this rather emphatic “no” for an answer, Toxtle proceeded to get into his car (again, not the Honda) and follow defendant to her home. When he arrived at defendant’s home, Toxtle parked next to defendant’s car — a Nissan Maxima — and before she could exit her vehicle, took both her car and house keys, refused to return them, and an argument ensued. This much both parties agree upon. However, the parties’ testimony differs significantly with respect to what they argued about, and what physically transpired during their concededly heated discussion.
*1134 With respect to the verbal content of their argument, Toxtle testified that the conversation was strictly limited to his attempts to “peacefully” resolve the issue of title to the Honda.
According to Toxtle he confronted defendant at Bally’s, raced back to her home, grabbed her house and car keys before she could leave her vehicle and refused to return them, for the sole purpose of politely asking that she amicably discuss the future of the 1991 Honda. To listen to Toxtle, he merely pleaded with defendant to quietly discuss and peaceably settle the title question, and no more, but she refused his gentlemanly remonstrations and instead met his soothing entreaties with cursing, punctuated by the swing of the Club and the slash of the knife.
On the other hand, defendant testified that she and Toxtle did argue, but not about the Honda. Indeed, according to defendant’s version of the events both at the Bally’s parking lot and outside her house, the argument was essentially one-sided with Toxtle hectoring Juarez about his desire to rekindle their romantic relationship, while pushing her in and around her car, and with Juarez refusing to discuss the matter and insisting upon the return of her keys and being left alone. When Toxtle refused to relent in his importunate behavior, she took matters into her own hands by pulling from underneath her car’s front seat first, the Club — which Toxtle promptly took from her before she could swing it at him — then a kitchen knife, typically used by Juarez to cut up oranges for her daughter’s soccer team. According to defendant’s account, she held the knife toward Toxtle with one hand, and demanded her keys with the other. Toxtle grabbed for the knife — as he had previously and with success grabbed the Club — and cut his hand when he tried to pull the knife from defendant’s grasp. Conversely, Toxtle testified that Juarez slashed at him with the knife at a 45-degree angle, and cut him in the process. According to Juarez, she then walked toward (or according to Toxtle, chased) Toxtle, knife in hand, around Juarez’s car until he eventually relinquished her house and car keys, throwing them, bloody, into her car. Defendant retrieved the keys and ran to her front door, with Toxtle following hard upon her and dripping blood on her front porch steps, until she reached the relative safety of her house and called the police.
Conclusions
As discussed in more detail below, the disposition of this case turns essentially upon the question of which version of events is more accurate — or, more to the point, whether the People have *1135 proven beyond a reasonable doubt that the version related by Toxtle occurred. This, the court finds, the People have failed, despite their best efforts, to do. Put bluntly, the main thrust of Toxtle’s account of events that evening is simply not credible. Indeed, key aspects of his testimony are contradicted by his history with respect to this defendant, the physical evidence, and common sense.
First, Toxtle’s consistent contention that the only topic of discussion in which he sought to engage defendant concerned the 1991 Honda strains credulity in light of the admitted prior romantic involvement between defendant and him, defendant’s serial terminations of it, and the admitted fact that neither the Honda nor its title were at or near the scene of the arguments on May 27. Common sense dictates that a major, if not the primary, bone of contention on the evening of May 27 was, as defendant testified, the on-again, off-again relationship between her and Toxtle. In light of the subsequent conduct of Toxtle as recounted at trial — particularly his accosting of defendant’s dance partner after he saw them together at a bar, for which Toxtle was arrested and pleaded guilty to the violation of harassment — it is more likely than not, as defendant testified, that Toxtle’s conversation that evening included at least some expressions of jealousy. The additional facts that after he followed defendant to her home, Toxtle quickly seized defendant’s car and house keys, refused to relinquish them until wounded, and then, as the trail of blood attests, followed her to the door of her home until she gained that sanctuary, further support the view that something more was at issue than a 14-year-old Honda.
As far as the cut on Toxtle’s finger is concerned, the physical evidence tends to support defendant’s version of events — that the wound resulted from Toxtle’s grabbing for the knife. The angle of the scar on Toxtle’s finger, as viewed by the court, as well as the photographs of the wound that were introduced into evidence, do not show a 45-degree angle slash wound which Toxtle claimed defendant intentionally inflicted. Rather, the nature of the wound and scar is consistent with a grabbing motion, which defendant testified Toxtle executed in order to snatch the knife from her grasp. The knife wound was therefore not intentionally inflicted by defendant in the manner related by Toxtle. And as far as the Club is concerned, no testimony was adduced to show that it was ever swung at Toxtle at all, much less with an intent to injure him. As discussed below, *1136 when these facts, as found by the court, are applied to each of the charges asserted against defendant, it is clear that the People have not sustained their burden of proving beyond a reasonable doubt that defendant committed a crime on May 27, 2005.
Counts 1 and 2: Assault in the Third Degree and Attempted Assault in the Third Degree (Penal Law §§ 120.00 and 110.00, 120.00)
In order to convict a defendant of the misdemeanor of assault in the third degree, the People must prove beyond a reasonable doubt the specific intent of the defendant to cause physical injury, and the causing (or attempt to cause, in the case of attempted assault) of such injury. (Penal Law § 120.00 [1]; Donnino, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law art 120.) In the instant case, the People have failed to prove the requisite element of intent with respect to either the knife or the Club. As discussed above, defendant did not intend to inflict physical injury upon Toxtle; the Club was never even swung, and the kitchen knife, the court finds, was not wielded for that purpose. Rather, Juarez’s purpose and intent, Toxtle’s inadvertent injury notwithstanding, was to retrieve her keys and be left alone. Accordingly, counts 1 and 2 of the information fall of their own weight and defendant is acquitted on those counts.
Counts 3 and 4: Criminal Possession of a Weapon in the Fourth Degree (Penal Law § 265.01 [2])
Counts 3 and 4 of the information, each charging criminal possession of a weapon in the fourth degree, with respect to the Club and the knife respectively, are similarly dispatched. Clearly, the Club and the kitchen knife, concedely owned by defendant, are not among the list of weapons — such as a gravity knife or a chuka stick — the mere possession of which proves unlawful. Rather, the issues are whether the knife or the Club are “dangerous instruments” within the meaning of Penal Law § 10.00 (13), and if so, whether under Penal Law § 265.01 (2) they were “possessed” by defendant “with intent to use the same unlawfully against another.” Case law and commentary alike indicate that whether a particular instrument is “dangerous” depends upon the context — that is, the manner in which it was used and the intent by which it was brandished. Since the seminal Court of Appeals case of People v Carter (53 NY2d 113 [1981]), the courts have adopted a “use-oriented” approach to determine whether an item which is not specifically listed under *1137 the Penal Law as dangerous should be deemed a “dangerous instrument” within the meaning of Penal Law § 265.01 (2), and other sections of the Penal Law that employ that term of art. In People v Carter, the Court of Appeals upheld a lower court determination that the common item of boots was, in the context of that case, a “dangerous instrument” when used to stomp upon and seriously injure another. As the Court held:
“The term ‘dangerous instrument’ is defined in subdivision 13 of section 10 of the Penal Law as ‘any instrument, article or substance . . . which, under the circumstances in which it is used ... is readily capable of causing death or serious physical injury.’ The statute makes no attempt to give an absolute definition of the term or to provide a list of items which can be considered dangerous instruments. Instead the statute states plainly that any ‘instrument, article or substance’, no matter how innocuous it may appear to be when used for its legitimate purpose, becomes a dangerous instrument when it is used in a manner which renders it readily capable of causing serious physical injury. (See Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law, § 10.00, p. 21.) The object itself need not be inherently dangerous. It is the temporary use rather than the inherent vice of the object which brings it within the purview of the statute.” (Id. at 116.)
Following Carter, most courts that have addressed the issue have employed the use-oriented approach to expand the reach of the definition of “dangerous instrument” so as to bring within its ambit otherwise innocuous, harmless items that were, in the context of the particular case, used with ill intent and for nefarious purposes. Thus, teeth, sticks, shoes, boots and screwdrivers have all been held to be “dangerous instruments” under the use-oriented approach. (See, e.g., People v Owusu, 248 AD2d 491, 492 [2d Dept 1998] [“It is the manner in which an item is used, not its inherent nature, which brings it within the purview of the statute. (Penal Law § 10.00 [13]) . . . Based on this ‘use-oriented’ approach ... we conclude that the defendant’s teeth, as used by him in this case, could be considered a dangerous instrument”]; People v Ray, 273 AD2d 611, 613 [3d Dept 2000] [“In determining whether a particular item fits within the purview of the statute, the manner in which the item was used is of paramount consideration, in recognition *1138 that an object which is innocuous when used for its proper purpose may become dangerous when used to cause injury . . . At trial, the People offered proof that defendant used his work boots to kick the victim in the head, chest, stomach and legs. Given the age and size differential between defendant and the victim, and the vulnerability of these areas of the body, it is evident that the boots were used in a manner readily capable of causing serious physical injury”]; People v Moyler, 256 AD2d 1108, 1108 [4th Dept 1998] [“Under the circumstances, the jury was entitled to determine whether the stick was a dangerous instrument within the meaning of Penal Law § 10.00 (13)”]; People v Ludwig, 155 AD2d 558, 559-560 [2d Dept 1989] [“Applying this ‘use-oriented’ approach, objects that may be deemed dangerous instruments under certain circumstances include a chair . . . ; a pool cue . . . ; a knife handle without a blade . . . ; and cloth used to restrain another person’s wrists . . . There was ample evidence at bar to support a finding that the defendant used the stick in a manner readily capable of causing serious physical injury”]; People v Holmes, 9 AD3d 689, 691 [3d Dept 2004] [“Either a hammer or a screwdriver can be a ‘(d)angerous instrument’ if used in a manner that ‘is readily capable of causing death or other serious physical injury’ ”].)
However, by the same token, the logic of the “use-oriented” approach dictates that items that appear, at first blush, to be dangerous — such as a kitchen knife or a Club — may not be “dangerous instruments” if they are not used by a defendant for the purpose and with the intent proscribed by the specific statute that he or she is charged with violating. Accordingly, courts have held objects such as razors and ice picks to be outside the definition of “dangerous instruments” when they were used for a more benign purpose than, as is the case with a criminal possession of a weapon in the fourth degree charge, the intent to cause physical injury. (See, e.g., People ex rel. Pena v New York State Div. of Parole, 83 AD2d 887, 888 [2d Dept 1981] [absent a showing that defendant intended to use it unlawfully, possession of a straight razor did not constitute the crime of criminal possession of a weapon in the fourth degree and therefore did not amount to a parole violation]; People v Moyler, 256 AD2d 1108, 1108 [4th Dept 1998] [whether a stick used to strike the victim was a “dangerous instrument” was an issue of fact for the jury to decide: “Nor did the court err in failing to charge the jury that a stick used by the victim’s girlfriend to strike defendant was a dangerous instrument as a matter of *1139 law. Under the circumstances, the jury was entitled to determine whether the stick was a dangerous instrument within the meaning of Penal Law § 10.00 (13)”]; People v Adamkiewicz, 298 NY 176 [1948] [ice pick held not to be a dangerous instrument]; People v Azor, 177 Misc 2d 427 [Sup Ct, Kings County 1998] [hammer held not to be a “dangerous instrument” within the meaning of Penal Law § 10.00 [13].)
Accordingly, as in the instant case, an otherwise innocuous kitchen knife may become a “dangerous instrument” if used “in a manner which renders it readily capable of causing serious physical injury.” (People v Carter, 53 NY2d at 116.) If it is not so used with such intent, it is, by the same token, not a “dangerous instrument,” no matter how sharp its blade. (Donnino, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law art 120.) The same holds true with respect to an object such as the Club. Indeed, Penal Law § 265.01 (2) — the statute underlying counts 3 and 4 charging criminal possession of a weapon in the fourth degree — effectively so recognizes by stating that possession of a “dangerous knife” or “dangerous or deadly instrument” will violate the statute only if it is possessed “with intent to use the same unlawfully against another.” (Id.)
In view of the foregoing, it is clear that the use to which defendant intended to put the Club and knife is dispositive of the issue of whether possession of them was criminal. Since the court has found that the People did not prove beyond a reasonable doubt that defendant wielded either the Club or the knife with the intent to injure Toxtle, defendant is not guilty of the weapons possession charges as well.
Counts 5 and 6: Menacing in the Second Degree (Penal Law § 120.14 [1])
The charges of menacing in the second degree — again, with respect to the Club and the kitchen knife — prove more problematic. In order to sustain the A misdemeanor charge of menacing in the second degree, as charged by the People under section 120.14 (1), the People must prove the following elements beyond a reasonable doubt: (1) that the defendant “displayed] a deadly weapon, dangerous instrument or what appears to be a . . . firearm,” and (2) that she did so with the intent to “place[ ] or attempt[ ] to place another person in reasonable fear of physical injury, serious physical injury or death.” (Penal Law § 120.14 [1].)
As discussed above, the question of whether an item that is not deemed by statute to be dangerous per se (Penal Law § 10.00 *1140 13) qualifies as a “dangerous instrument,” as that term is used in the Penal Law, turns upon resolving the question of the use to which it was put in the context charged, and the intent of the actor in wielding it. In the instant case, as noted infra, the Club and kitchen knife are not dangerous per se. Nor did the People prove, beyond a reasonable doubt, that either was wielded by defendant with the requisite intent to injure Toxtle or to “place [him] in reasonable fear” of injury. On the contrary, the evidence adduced at the trial indicated that in each instance, the Club and the knife were intended to be used by defendant to stop Toxtle’s importunate verbal and physical conduct — put simply, to do what words alone apparently could not, to leave defendant alone. Indeed, had Toxtle felt so threatened with injury by the Club or the knife, he could readily have dropped defendant’s keys and left. The fact that he instead advanced toward Juarez and tried to seize each of these items speaks volumes as to whether he believed he was threatened, and whether defendant’s true, objective intent was to threaten him with injury. In the similar case of People v Vazquez (136 Misc 2d 1057, 1059 [Crim Ct, NY County 1987]) the court held that the display of a weapon that is in fact dangerous per se under the Penal Law definition of “dangerous instrument” (§ 10.00 [13])— a hand gun — did not even amount to the lesser charge of menacing in the third degree since the defendant, by such display, did not intend to threaten imminent physical injury. As the court held (at 1059):
“Penal Law § 120.15 provides: ‘A person is guilty of menacing when, by physical menace, he intentionally places or attempts to place another person in fear of imminent serious physical injury.’ In order to prove this charge, the People must prove that the defendant committed a physical act which placed the defendant in fear of imminent serious injury. (People v Stephens, 100 Misc 2d 267, 268 [Dist Ct, Suffolk County 1979].)
“The question then becomes whether the act of exposing the handle of the bolstered gun constituted a threat of imminent physical injury. Imminent is defined as ‘[n]ear at hand ... on the point of happening;’ and imminent peril as ‘impending . . . not remote, uncertain, or contingent’. (Black’s Law Dictionary [5th ed 1979].) Mr. DeBari, by his own testimony, made it clear that the defendant’s threat was that he would use the gun ‘next time’. More *1141 over, the defendant never removed the gun from its holster. Under these circumstances the threat is less than imminent, particularly when accompanied by defendant’s act of leaving the building.”
Here, the kitchen knife and Club were therefore not “dangerous instruments” within the meaning of the statute, nor did defendant intend, by her actions with them, to use them unlawfully in the manner proscribed by the statute. Since neither of these two elements were proven beyond a reasonable doubt, defendant is acquitted of the two counts of menacing in the second degree.
Count 7: Harassment in the Second Degree (Penal Law § 240.26 [1])
The question of whether the People have proven beyond a reasonable doubt, under the evidence adduced at trial, that defendant committed one of the crimes charged in the misdemeanor information — assault in the third degree, attempted assault in the third degree, criminal possession of a weapon in the fourth degree and menacing in the second degree — has been answered in the negative. However, count 7 of the information charging the violation, not a crime, of harassment in the second degree remains to be addressed.
While defendant’s efforts with the Club and kitchen knife in order to help rid herself of Toxtle’s overly persistent actions may not amount to criminal conduct, such self-help efforts are not to be encouraged, particularly when alternate means of redress are available. Here, defendant could have called for help, and in the early evening hours on the Friday before Memorial Day in a residential neighborhood, such cries may have been answered. She also could have tried to run to a neighbor’s house. She chose to do neither, but instead confronted Toxtle with the kitchen knife and, after he cut his finger on it, walked toward him until she was able to recover her house keys. That Toxtle was, at least at that point, “annoyed” or “alarmed” (Penal Law § 240.46), cannot be gainsaid.
Accordingly, the People have sustained their burden of proof with respect to count 7, the charge of harassment in the second degree, and the court finds defendant guilty of that violation.